431 So.2d 969 (1982)
MORRISON'S CAFETERIA OF MONTGOMERY, INC.
v.
Inez HADDOX, etc.
Civ. 2867.
Court of Civil Appeals of Alabama.
May 26, 1982.
Rehearing Denied July 7, 1982.
*970 Robert C. Black of Hill, Hill, Carter, Franco, Cole & Black, Montgomery, for appellant.
W. Stephen Graves and Robert M. Alton, Jr., Montgomery, for appellees Inez Haddox and Rodney Haddox.
Dennis R. Bailey of Rushton, Stakely, Johnston & Garrett, Montgomery, for appellee Pinellas Seafood Co., Inc.
*971 WRIGHT, Presiding Judge.
Plaintiffs, Mrs. Inez Haddox and her minor son Rodney, recovered jury verdicts totalling $6,000.78 against Morrison's Cafeteria of Montgomery, Inc. (Morrison's) for injuries sustained when Rodney choked on a fish bone while dining at Morrison's. Morrison's appeals.
The record reveals the following:
Mrs. Haddox testified that around 2:00 or 3:00 P.M. one afternoon in May 1980, she and her three-year-old son Rodney went to Morrison's Cafeteria. Rodney wanted some fish. Mrs. Haddox took one tray and she and Rodney proceeded down the food line. Mrs. Haddox's testimony as to how she received a portion of fish almondine is conflicting. At one point in her testimony she stated that she pointed to a piece of fish and told the man behind the counter that she would take that piece of fish. At another point she stated that she asked for fried fish. At yet another point she stated that she asked for fried fish fillet. She received a portion of the fish and put it on her tray, together with other food and drink. She saw no signs advertising the fish dish. No one told her that it was a fillet or that it was boneless. She subjectively believed it to be a fillet because of its shape and her prior experience with eating fish dishes at Morrison's. When she and Rodney were seated, Mrs. Haddox cut off a portion of the fish and put it on a plate for Rodney. She testified that she pulled it apart with her knife and fork into very small pieces. At one point Mrs. Haddox testified that she pulled Rodney's portion apart to check for bones. Later in her testimony she stated that she was merely cutting it into bite-sized pieces and not checking for bones. Rodney apparently became choked on the first bit of fish. When Rodney was taken to the hospital it was discovered that a fishbone approximately one centimeter in length was lodged in his tonsil. The bone was removed after Rodney stayed in the hospital overnight. He suffered no permanent physical injury as a result of the incident. Mrs. Haddox stated that she did not know how Morrison's could have known there was a small bone in the fish. She testified, however, that the manager and other personnel at Morrison's were extremely rude to her during the course of Rodney's difficulty. She could not persuade anyone to take her to the hospital and was told at the checkout counter that she must pay her bill before she left.
The manager of Morrison's at the time of Rodney's injury testified that the fish which Mrs. Haddox bought was Spanish mackerel fillet. Morrison's bought the fish from Pinellas Seafood Company, Inc. (Pinellas). Pinellas ships the fish to Morrison's in five to ten-pound boxes. Morrison's uses this fish to prepare a dish they advertise as fish almondine. It is not advertised as boneless and employees are instructed not to tell customers that the dish is boneless. Morrison's does not offer the fish on a child's plate because the fish does sometimes contain bones.
An employee of Pinellas at the time of Rodney's injury testified that Pinellas used machines to fillet the Spanish mackerel bought by Morrison's. Such machines are commonly used by other wholesale fish processors. Machine filleting strips the sides of the fish away from the backbone. Using this method it is impossible to prevent the occasional presence of small bones in the fillets. Government regulations allow for the presence of small bones in fillets. The employee stated that Morrison's had not been told that Pinellas' fillets were boneless. Approximately ninety-nine percent of the fillets which Pinellas produces are sold to Morrison's, and Pinellas is aware that Morrison's in turn sells the fillets to its customers. He further testified that in order for Pinellas or Morrison's to check for bones in the fillets they would have to cut them into tiny pieces. This would destroy the fillets.
Another witness, an employee of a fish wholesaler and retailer, stated that a whole fillet of Spanish mackerel could be recognized by its shape.
Mrs. Haddox brought suit on behalf of Rodney and herself against Morrison's and Pinellas to recover medical expenses and to *972 compensate Rodney for his pain and suffering. Her complaint also contained a claim against Morrison's for false imprisonment. Morrison's filed a cross claim against Pinellas. Motions for directed verdicts were denied as to all claims except that for false imprisonment. Mrs. Haddox does not cross appeal the directed verdict in favor of Morrison's on the false imprisonment count.
The trial court submitted the case to the jury on the theories of implied warranty of fitness for human consumption and the Alabama Extended Manufacturer's Liability Doctrine (AEMLD) against Morrison's; the AEMLD as against Pinellas; and implied warranty as to Morrison's cross claim against Pinellas.
The jury returned a verdict in favor of Mrs. Haddox and against Morrison's in the amount of $1,000.78. Rodney was awarded a verdict against Morrison's for $5,000.00. The jury found in favor of Pinellas on the cross claim. Morrison's motions for JNOV and a new trial were denied.
The first issue presented on appeal is whether the trial court erred in denying Morrison's motions for directed verdict and for judgment notwithstanding the verdict (JNOV) against Mrs. Haddox and Rodney on the implied warranty and AEMLD claims.
A motion for JNOV tests the sufficiency of the evidence in the same way as does a motion for directed verdict at the close of the evidence. Williamson v. United Farm Agency of Alabama, Inc., 401 So.2d 759 (Ala.1981). A motion for directed verdict is proper in two instances: (1) where there is a complete absence of pleadings or proof on an issue material to the cause of action or defense; and (2) where there are no controverted issues of fact upon which reasonable minds could differ. Perdue v. Mitchell, 373 So.2d 650 (Ala.1979).
The implied warranty claim arises out of § 7-2-314, Code of Alabama (1975) which provides in part:
(1) Unless excluded or modified (§ 7-2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.
(2) Goods to be merchantable must be at least such as:
....
(c) Are fit for the ordinary purposes for which such goods are used....
In serving the fish to its customer, Morrison's impliedly warranted that it was fit for human consumption. The rule is well settled that the seller of products that are to be used for human consumption warrants that they are suitable for that purpose. Alabama Coca-Cola Bottling Company v. Ezzell, 22 Ala.App. 210, 114 So. 278 (1927).
The precise facts of this case present a question of first impression in this jurisdiction. Morrison's urges this court to adopt the so-called "foreign-natural" rule and determine as a matter of law that a bone in a piece of fish does not breach the implied warranty. The "foreign-natural" rule has been stated as follows:
Bones which are natural to the type of meat served cannot legitimately be called a foreign substance, and a consumer who eats meat dishes ought to anticipate and be on his guard against the presence of such bones. At least he cannot hold the restaurant keeper whose representation implied by law is that the meat dish is reasonably fit for human consumption, liable for any injury occurring as a result of the presence of [such bones].
Shapiro v. Hotel Statler Corporation, 132 F.Supp. 891 (S.D.Cal.1955).
After due consideration, however, we reject the artificial and inflexible "foreignnatural" rule in favor of the "reasonable expectation" test. Under the "reasonable expectation" test, the naturalness of the substance to the food served is only important in determining whether the consumer might reasonably expect to find such substance in the particular style or type of food served. Zabner v. Howard Johnson's, Inc., *973 201 So.2d 824 (Fla.App.1967). The key question under the "reasonable expectation" test is not whether the object is foreign or natural but whether the consumer ought to have anticipated the injury-producing object in the final product. Matthews v. Campbell Soup Company, 380 F.Supp. 1061 (S.D.Tex.1974). Furthermore, what a consumer is reasonably justified in expecting is a question for the jury. Hochberg v. O'Donnell's Restaurant, Inc., 272 A.2d 846 (D.C.App.1971).
Mrs. Haddox testified that she believed the fish to be a fillet and evidence in the record supports the reasonableness of this conclusion. The dictionary definition of fillet was shown to be "a boneless piece of fish." The fish almondine sold to Mrs. Haddox was, in fact, a fillet. We find that the question whether Mrs. Haddox as a consumer could reasonably expect the fish as sold by Morrison's to be boneless was properly a question for the jury.
The requisites of a cause of action under the AEMLD were first enunciated in Casrell v. Altec Industries, Inc., 335 So.2d 128 (Ala.1976) and Atkins v. American Motors Corporation, 335 So.2d 134 (Ala.1976). In a combination of the principles of merchantability under § 7-2-314, Code (1975) and the "unreasonably dangerous" language found in the Restatement (Second) of Torts, § 402A,[1] the Alabama Supreme Court set out a modified version of strict liability by defining "defect" as:
[T]hat which renders a product "unreasonably dangerous," i.e., not fit for its intended purpose.... "Defective" is interpreted to mean that the product does not meet the reasonable expectations of an ordinary consumer as to its safety. Casrell, supra, at 133.
Whether a product is unreasonably dangerous is ordinarily a question for the trier of fact. Atkins, supra. Again, under the facts of this case, we find that the question of whether a one-centimeter bone in a "fillet" is a defect was properly submitted to the jury.
The second issue raised on appeal is whether the trial court erred in denying Morrison's motion for a new trial based on inconsistent verdicts. The rendering of clearly inconsistent verdicts requires a new trial. Lindsay v. Hackney, 283 Ala. 372, 217 So.2d 238 (1968). When it appears that the verdict cannot be sustained on any reasonable hypothesis of fact founded on the evidence, it must be set aside. Diaz v. Chapman, 373 So.2d 339 (Ala.Civ.App.1979).
Morrison's submits that if the general verdict against it is predicated on the AEMLD, the failure to find also against Pinellas is inconsistent. In view of the elements necessary to recovery under the AEMLD as set out in § 402A of the Restatement, Morrison's contends that the fillet did reach Mrs. Haddox and Rodney "without substantial change in the condition in which it [was] sold" by Pinellas. Furthermore, Morrison's did not alter or create the alleged defective condition of the fillet. Although we tend to agree that on the instant facts a verdict for Pinellas might be inconsistent with a verdict against Morrison's on the AEMLD claim, we do not find it necessary to make that determination. The jury returned a general verdict without specifying upon which theory liability was imposed. A general verdict referable to one good claim in a complaint is a good verdict. Automotive Acceptance Corporation *974 v. Powell, 45 Ala.App. 596, 234 So.2d 593 (1970). The claim for breach of an implied warranty is such a count.
Morrison's argues that recovery against Morrison's on the implied warranty theory is completely inconsistent with a verdict in favor of Pinellas on the cross claim. We do not agree.
Under the "reasonable expectations" test, there was no evidence that Morrison's could have reasonably expected the fillet purchased from Pinellas to be boneless. The record shows that Morrison's was aware of the often presence of small bones in the fillets. Such knowledge could have been determined by the jury to prevent there being extended the same warranty of fitness by Pinellas to Morrison's as was extended by Morrison's to Mrs. Haddox. There is evidence that Mrs. Haddox could have reasonably expected the fillet to be boneless. Morrison's knowledge to the contrary prevented such expectation. Such evidence, if believed by the jury, would support a verdict against Morrison's on breach of the implied warranty to Mrs. Haddox and Rodney.
New trials cannot be granted merely because the court sitting as a jury would have rendered a verdict different from that returned by the jury. Johnson v. Howard, 279 Ala. 16, 181 So.2d 85 (1965). The denial of Morrison's motion for a new trial was not error.
Though finding sufficient evidence to furnish the required scintilla for affirming the submission to the jury, one would be naive not to recognize that the acts of Morrison's subsequent to the sale possibly contributed greatly to the verdict of the jury. The judgment is affirmed.
AFFIRMED.
BRADLEY, J., concurs.
HOLMES, J., concurs in part and dissents in part.
HOLMES, Judge (concurring in part, dissenting in part).
I agree with the majority opinion insofar as it rejects the "foreign-natural" test in favor of the "reasonable expectation" test. I do not agree, however, that the "reasonable expectation" test, under the present facts, mandates that this court affirm the trial court.
In Mix v. Ingersoll Candy Co., 6 Cal.2d 674, 59 P.2d 144 (1936), the plaintiff was injured when he swallowed a fragment of a chicken bone while eating a chicken pie. The plaintiff brought action against the restaurant which served the pie alleging breach of the implied warranty of fitness which was imposed upon the restaurant by statute. The California Supreme Court held that a chicken bone in a chicken pie did not breach the warranty. In so holding the court stated:
Although it may frequently be a question for a jury as the trier of facts to determine whether or not the particular defect alleged rendered the food not reasonably fit for human consumption, yet certain cases present facts from which the court itself may say as a matter of law that the alleged defect does not fall within the terms of the statute.
6 Cal.2d at 681-82, 59 P.2d at 148.
It is my position that the facts of this case present an instance wherein this court should find, as a matter of law, that a one centimeter bone that is found in a fish fillet makes that fish neither unfit for human consumption nor unreasonably dangerous.
I base this conclusion on several factors that are present in this case. First of all it is common knowledge that fish have many bones. Furthermore, government regulations regarding fillets recognize this and allow for the presence of some bones in fillets. A one centimeter bone does not violate any of the government regulations regarding fillets. 50 C.F.R. §§ 263.101-.104 (1979). Finally, it was undisputed that, in light of the process used to mass produce fillets, it was commercially impractical to remove all bones.
*975 I stress that my opinion is based solely upon the facts of this case. For instance, if there had been a representation that the fish was boneless or if the bone had been larger or if there had been many bones, my conclusion might well be different. Under these facts, however, I would hold as a matter of law that the implied warranty of merchantability was not breached and that the AEMLD was not violated.
Needless to say, I would reverse the learned trial judge for his failure to grant Morrison's motion for directed verdict.
NOTES
[1] Section 402A provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property if,
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.