431 So.2d 975 (1983)
Ex parte MORRISON'S CAFETERIA OF MONTGOMERY, INC.
(Re MORRISON'S CAFETERIA OF MONTGOMERY, INC. v. Inez HADDOX, Etc.)
81-886.
Supreme Court of Alabama.
March 11, 1983.
Robert C. Black of Hill, Hill, Carter, Franco, Cole & Black, Montgomery, for Morrison's Cafeteria of Montgomery, Inc.
Dennis R. Bailey of Rushton, Stakely, Johnston & Garrett, Montgomery, for Pinellas Seafood Co., Inc.
Robert M. Alton, Jr., Montgomery, for respondents.
*976 SHORES, Justice.
This case presents a question of first impression in this state. Morrison's Cafeteria of Montgomery, Inc., petitioned this Court for a writ of certiorari to the Court of Civil Appeals following that court's affirmance of the trial court's judgment entered on a jury verdict totalling $6,000.78 against Morrison's for injuries sustained when Rodney Haddox, a minor, choked on a fishbone while dining at the restaurant.
The facts as found by the Court of Civil Appeals and by which we are bound are as follows:
"Mrs. Haddox testified that around 2:00 or 3:00 p.m. one afternoon in May 1980, she and her three-year-old son Rodney went to Morrison's Cafeteria. Rodney wanted some fish. Mrs. Haddox took one tray and she and Rodney proceeded down the food line. Mrs. Haddox's testimony as to how she received a portion of fish almondine is conflicting. At one point in her testimony she stated that she pointed to a piece of fish and told the man behind the counter that she would take that piece of fish. At another point she stated that she asked for fried fish. At yet another point she stated that she asked for fried fish fillet. She received a portion of the fish and put it on her tray, together with another food and drink. She saw no signs advertising the fish dish. No one told her that it was a fillet or that it was boneless. She subjectively believed it to be a fillet because of its shape and her prior experience with eating fish dishes at Morrison's. When she and Rodney were seated, Mrs. Haddox cut off a portion of the fish and put it on a plate for Rodney. She testified that she pulled it apart with her knife and fork into very small pieces. At one point Mrs. Haddox testified that she pulled Rodney's portion apart to check for bones. Later in her testimony she stated that she was merely cutting it into bitesized pieces and not checking for bones. Rodney apparently became choked on the first bit of fish. When Rodney was taken to the hospital, it was discovered that a fishbone approximately one centimeter in length was lodged in his tonsil. The bone was removed after Rodney stayed in the hospital overnight. He suffered no permanent physical injury as a result of the incident. Mrs. Haddox stated that she did not know how Morrison's could have known there was a small bone in the fish. She testified however, that the manager and other personnel at Morrison's were extremely rude to her during the course of Rodney's difficulty. She could not persuade anyone to take her to the hospital and was told at the checkout counter that she must pay her bill before she left.
"The manager of Morrison's at the time of Rodney's injury testified that the fish which Mrs. Haddox bought was Spanish Mackerel fillet. Morrison's bought the fish from Pinellas Seafood Company, Inc. (Pinellas). Pinellas ships the fish to Morrison's in five- to ten-pound boxes. Morrison's uses this fish to prepare a dish they advertise as Fish Almondine. It is not advertised as boneless and employees are instructed not to tell customers that the dish is boneless. Morrison's does not offer the fish on a child's plate because the fish does sometimes contain bones.
An employee of Pinellas at the time of Rodney's injury testified that Pinellas used machines to fillet the Spanish Mackerel bought by Morrison's. Such machines are commonly used by other wholesale fish processors. Machine filleting strips the sides of the fish away from the backbone. Using this method it is impossible to prevent the occasional presence of small bones in the fillets. Government regulations allow for the presence of small bones in fillets. The employee stated that Morrison's had not been told that Pinellas's fillets were boneless. Approximately ninety-nine percent of the fillets which Pinellas produces are sold to Morrison's, and Pinellas is aware that Morrison's in turn sells the fillets to its customers. He further testified that in order for Pinellas or Morrison's to check for bones in the fillets they would have to cut them into tiny pieces. This would destroy the fillets.

*977 "Another witness, an employee of a fish wholesaler and retailer, stated that a whole fillet of Spanish Mackerel could be recognized by its shape.
"Mrs. Haddox brought suit on behalf of Rodney and herself against Morrison's and Pinellas to recover medical expenses and to compensate Rodney for his pain and suffering. Her complaint also contained a claim against Morrison's for false imprisonment. Morrison's filed a cross claim against Pinellas. Motions for directed verdicts were denied as to all claims except that for false imprisonment. Mrs. Haddox does not cross appeal the directed verdict in favor of Morrison's on the false imprisonment count.
"The trial court submitted the case to the jury on the theories of implied warranty of fitness for human consumption and the Alabama Extended Manufacturer's Liability Doctrine (AEMLD) against Morrison's; the AEMLD as against Pinellas; and implied warranty as to Morrison's cross claim against Pinellas.
"The jury returned a verdict in favor of Mrs. Haddox and against Morrison's in the amount of $1,000.78. Rodney was awarded a verdict against Morrison's for $5,000.00. The jury found in favor of Pinellas on the cross claim. Morrison's motions for JNOV and a new trial were denied."
Morrison's appealed to the Court of Civil Appeals, citing as error: (1) the trial court's denial of Morrison's motions for a directed verdict and JNOV against Haddox on the implied warranty and AEMLD claims; and (2) the trial court's denial of Morrison's motions for a new trial based on alleged inconsistent verdicts as to Morrison's and Pinellas. Morrison's urged the Court of Civil Appeals to adopt the so-called "foreign-natural" rule and determine as a matter of law that a bone in a piece of fish does not breach the implied warranty of fitness.
A divided Court of Civil Appeals, in affirming the trial court's decision, rejected the "foreign-natural" rule in favor of the "reasonable expectation" test. Judge Holmes, dissenting in part, agreed with the majority's adoption of the reasonable expectation test, but did not agree that the test under the present facts mandated an affirmance of the trial court.
This Court granted Morrison's petition for certiorari on October 19, 1982. We reverse.
The issue concerns the interpretation to be given Ala.Code 1975, § 7-2-314, which provides in part:
"(1) Unless excluded or modified (section 7-2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.
"(2) Goods to be merchantable must be at least such as:
". . . .
"(c) Are fit for the ordinary purposes for which such goods are used...."
The issue also concerns the Alabama Extended Manufacturer's Liability Doctrine, which requires that "a plaintiff must prove he suffered injury or damages to himself or his property by one who sold a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer...." Atkins v. American Motors Corp., 335 So.2d 134, 141 (Ala.1976).
The two standards go hand-in-hand, for it is apparent that a food product is defective or unreasonably dangerous if it is unmerchantable or unfit for human consumption. See Matthews v. Campbell Soup Co., 380 F.Supp. 1061 (S.D.Tex.1974).
The Court of Civil Appeals rejected the adoption of the so-called "foreign-natural" rule urged by Morrison's. This rule first appeared in Mix v. Ingersoll Candy Co., 6 Cal.2d 674, 59 P.2d 144 (1936), where the court, holding that a fragment of chicken bone did not render a chicken pie unfit for human consumption as a matter of law, stated:
"Although it may frequently be a question for a jury as the trier of facts to determine whether or not the particular *978 defect alleged rendered the food not reasonably fit for human consumption, yet certain cases present facts from which the court itself may say as a matter of law that the alleged defect does not fall within the terms of the statute. It is insisted that the court may so determine herein only if it is empowered to take judicial notice of the alleged fact that chicken pies usually contain chicken bones. It is not necessary to go so far as to hold that chicken pies usually contain chicken bones. It is sufficient if it may be said that as a matter of common knowledge chicken pies occasionally contain chicken bones. We have no hesitancy in so holding, and we are of the opinion that despite the fact that a chicken bone may occasionally be encountered in a chicken pie, such chicken pie, in the absence of some further defect, is reasonably fit for human consumption. Bones which are natural to the type of meat served cannot legitimately be called a foreign substance, and a consumer who eats meat dishes ought to anticipate and be on his guard against the presence of such bones. At least he cannot hold the restaurant keeper whose representation implied by law is that the meat dish is reasonably fit for human consumption, liable for any injury occurring as a result of the presence of a chicken bone in such chicken pie." (Emphasis added.)
59 P.2d at 148.
The undesirability of the foreign substance test lies in the artificial application at the initial stage of processing the food without consideration of the expectations of the consumer in the final product served. Surely it is within the expectation of the consumer to find a bone in a T-bone steak; but just as certainly it is reasonable for a consumer not to expect to find a bone in a package of hamburger meat. It is entirely possible that a natural substance found in processed food may be more indigestible and cause more injury than many "foreign" substances.
The "reasonable expectation" test as adopted by the Florida courts in Zabner v. Howard Johnson's, Inc., 201 So.2d 824 (Fla. Dist.Ct.App.1967), appears to us a more logical approach. Under that test, the pivotal issue is what is reasonably expected by the consumer in the food as served, not what might be natural to the ingredients of that food prior to preparation. Id. at 826. "Naturalness of the substance to any ingredients in the food served is important only in determining whether the consumer may reasonably expect to find such substance in the particular type of dish or style of food served." Id.
Adoption in this jurisdiction of the reasonable expectation test is compatible with the Alabama Extended Manufacturer's Liability Doctrine and the implied warranty of merchantability (§ 7-2-314). The terms "defect," "unreasonably dangerous," and "merchantable" all focus upon the expectations of the ordinary consumer, possessed of the ordinary knowledge common to the community. Casrell v. Altec Industries, Inc., 335 So.2d 128, 133 (Ala.1976), quoting Welch v. Outboard Marine Corp., 481 F.2d 252 (5th Cir.1973).
The Court of Civil Appeals held that what a consumer is reasonably justified in expecting is a question for the jury. Morrison's Cafeteria of Montgomery, Inc. v. Haddox, 431 So.2d 969 (Ala.Civ.App.1982), citing Hochberg v. O'Donnell's Restaurant, Inc., 272 A.2d 846 (D.C.App.1971). We agree that in most instances this would be true. In other instances, however, we agree with the California Supreme Court in Mix v. Ingersoll Candy Co., supra, wherein that court held:
"Although it may frequently be a question for a jury as the trier of facts to determine whether or not the particular defect alleged rendered the food not reasonably fit for human consumption, yet certain cases present facts from which the court itself may say as a matter of law that the alleged defect does not fall within the terms of the statute."
6 Cal.2d at 681-82, 59 P.2d at 148. As the court concluded in Hochberg, supra, after holding the question of reasonable expectation to normally be a jury question: "It is a *979 different matter if one is injured by a bone while eating a chicken leg or steak or a whole baked fish. There, it may well be held as a matter of law that the consumer should reasonably expect to find a bone." 272 A.2d at 849.
We agree with Judge Holmes in the instant case that, on the facts presented, the Court should find as a matter of law that a one-centimeter bone found in a fish fillet "makes that fish neither unfit for human consumption nor unreasonably dangerous." Morrison's Cafeteria of Montgomery, Inc. v. Haddox, 431 So.2d 969 (Ala. Civ.App.1982), Holmes, J., dissenting.
Courts cannot and must not ignore the common experience of life and allow rules to develop that would make sellers of food or other consumer goods insurers of the products they sell. As has been pointed out, "consumers do have rather high expectations as to the safety of the products which are offered for sale to them ... [and] they have a rather low threshold for the frustration of these expectations." Rheingold, What Are the Consumer's "Reasonable Expectations"?, 22 Bus.Law. 589 (1967).
On the facts presented here, we find as a matter of law that the presence of a onecentimeter bone did not render the piece of fish unreasonably dangerous. As Judge Holmes stated:
"I base this conclusion on several factors that are present in this case. First of all, it is common knowledge that fish have many bones. Furthermore, government regulations regarding fillets recognize this and allow for the presence of some bones in fillets. A one centimeter bone does not violate any of the government regulations regarding fillets. 50 C.F.R. § 263.101-.104 (1979). Finally, it was undisputed that, in light of the process used to mass produce fillets, it was commercially impractical to remove all bones.
"I stress that my opinion is based solely upon the facts of this case. For instance, if there had been a representation that the fish was boneless or if the bone had been larger or if there had been many bones, my conclusion might well be different. Under these facts, however, I would hold as a matter of law that the implied warranty of merchantability was not breached and that the AEMLD was not violated."
We find, therefore, that the trial court erred in denying Morrison's motions for directed verdict and JNOV. The issue of inconsistent verdicts as related to Morrison's and Pinellas thus becomes moot and need not be addressed.
For these reasons, the judgment of the Court of Civil Appeals is due to be reversed and the cause remanded.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX, JONES, ALMON, EMBRY, BEATTY, and ADAMS, JJ., concur.
FAULKNER, J., dissents.
FAULKNER, Justice (dissenting):
I would affirm the judgment of the Court of Civil Appeals.