The plaintiffs, Pansi and James Graham, appeal from a summary judgment for the defendant, Sprout-Waldron and Company, in their action for damages based on injuries sustained by Mrs. Graham. The plaintiffs allege that the injuries were caused by Sprout-Waldron's design and construction of a residue bin for corn by-products; they allege that the residue bin was defective because of its design and construction. The issues are whether the Grahams provided substantial evidence that the bins were unreasonably dangerous, for purposes of the Grahams' claim under the Alabama Extended Manufacturer's Liability Doctrine (the "AEMLD") and whether Sprout-Waldron was negligent in failing to install devices that the Grahams allege would have prevented Mrs. Graham's injuries.
Mrs. Graham was injured on November 17, 1988, at her place of employment, a plant operated by American Fructose Company of Decatur, Alabama. American Fructose manufactures fructose sugar products from corn. Several by-products of the refining process are sold to various companies to be used in the manufacture of other products. These by-products are stored in bins within the residue storage building at American Fructose until they can be loaded for transport on *Page 870 
either trucks or rail cars. Mrs. Graham worked as a material handler; her job involved loading rail cars or trucks with the by-products from the bins in the residue building. In addition, at the end of their daily shifts material handlers check the storage bins to make sure that they are empty. The material handlers climb ladders and beat on the sides of the bins with hammers, noting whether the beating produces a "hollow" sound or a "full" sound. When a bin becomes clogged, the material handlers also remove the clog by beating on the sides of the bin with a hammer. Neither catwalks nor scaffolding was provided for material handlers to stand on while beating on the bins.
On the day of the accident, Mrs. Graham was checking the storage bins in the residue storage building to make sure that the bins were empty at the end of her shift. Mrs. Graham placed a wooden ladder beside the bin and adjusted the ladder by locking the supports into position before ascending the ladder. Mrs. Graham climbed to the second step from the top and began beating on the side of the bin with a hammer. It is unclear whether the ladder collapsed, whether Mrs. Graham fell, or whether something else happened to cause her accident, but her face struck the side of the bin and she landed on the floor on her knees.
American Fructose had contracted with Sprout-Waldron for Sprout-Waldron to construct the residue storage building at the Decatur plant in 1975. Sprout-Waldron was to provide a conveying system for the residue storage building as a means of getting materials there for storage and as a means of unloading the stored materials into trucks or rail cars. When the facility was constructed, it was common knowledge in the industry that the by-products involved had a propensity to stick to the bins or to "bridge," that is, to interlock, and not flow through the bins. A possible alternative to banging on the bins with hammers to dislodge residue and to clear bridging was installing mechanical vibrators. Vibrators were readily available when the residue storage building was constructed.
The first issue is whether the summary judgment for Sprout-Waldron was proper as to the claim that the bins designed and constructed by Sprout-Waldron at the American Fructose facility were defective or unreasonably dangerous within the meaning of the AEMLD. The AEMLD imposes liability upon Sprout-Waldron if the Grahams establish that the bin involved was defective or unreasonably dangerous and that the defect or dangerousness proximately caused Mrs. Graham's injuries. Specifically, the companion cases of Casrell v. AltecIndustries, Inc., 335 So.2d 128 (Ala. 1976), and Atkins v.American Motors Corp., 335 So.2d 134 (Ala. 1976), require that, to establish liability under the AEMLD, a plaintiff must show:
 "(1) he suffered injury or damages to himself or his property by one who sells a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if
 "(a) the seller engaged in the business of selling such a product, and
 "(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold."
Casrell, 335 So.2d at 132-33. The defendant has not disputed the plaintiffs' contention that the residue storage bin at issue in this case is a "product" within the meaning of the AEMLD. See Wells v. Clowers Constr. Co., 476 So.2d 105
(Ala. 1985).
The manufacturer of a product is not required to produce the safest possible product, but only to produce a product that is reasonably safe when put to its intended use. Casrell, supra;Atkins, supra; Yarbrough v. Sears, Roebuck Co., 628 So.2d 478
(Ala. 1993). Whether a product is defective or unreasonably dangerous depends upon whether the product meets the reasonable expectations of the ultimate consumer, Casrell, 335 So.2d at 133 (citing Restatement (Second) of Torts § 402A cmt. g and cmt. i (1965)); Beech v. Outboard Marine Corp., 584 So.2d 447
(Ala. 1991); Deere Co. v. Grose, 586 So.2d 196 (Ala. 1991);Sears, Roebuck Co. v. Haven Hills Farm, Inc., 395 So.2d 991
(Ala. 1981); see Ex parte Morrison's *Page 871 Cafeteria of Montgomery, Inc., 431 So.2d 975 (Ala. 1983). At least in the present context, where a person is injured by a product purchased by and for the business of the injured person's employer, this standard requires a court to decide whether the product is in a condition not reasonably to be expected by the employer or by the employees who work with the product. See Hawkins v. Montgomery Industries Int'l, Inc.,536 So.2d 922 (Ala. 1988).
Sprout-Waldron had the initial burden, upon its motion for summary judgment, to make a prima facie showing that there was no genuine issue of material fact and that it was entitled to a judgment as a matter of law. Lowe v. East End Memorial Hosp. Health Ctr., 477 So.2d 339 (Ala. 1985); Ala.R.Civ.P. 56. The evidence offered in support of Sprout-Waldron's motion showed that it was part of Mrs. Graham's job, as well as the jobs of all the other material handlers, to climb ladders and to hit on the bins with hammers to unclog them and to determine if they are empty. Sprout Waldron's evidence further established that bridging of these kinds of materials is an industry-wide problem of which everyone involved in the Sprout-Waldron/American Fructose contract was aware; that there is no generally accepted solution to the problem; and that it is common practice in the industry to unclog the bins by beating on them with hammers.
Relating to the use of vibrators to unclog the bins, Sprout-Waldron's evidence showed that the company is opposed to the use of vibrators as a means of maintaining the flow in bins because vibrators tend to pack the product. Vibrators were tried on some types of bins and on the rail car portion of the operation at American Fructose, but the director of operations at the mill stated that the vibrators did not have much impact; that vibrators were no more efficient in maintaining flow than the use of hammers; and that vibrators may cause metal fatigue and cause more damage to the bins than a hammer causes. American Fructose's maintenance manager stated that he had had 22 years' experience at a company he called "American Maize" in Hammond, Indiana, before coming to American Fructose in 1977; that in Hammond, vibrators were used on bins storing the same products as those stored at Sprout-Waldron; and that the bins in Hammond had had problems with bridging that were corrected by using hammers. Mrs. Graham's supervisor stated that some of the American Fructose storage bins had been equipped with vibrators after Mrs. Graham's injury; that the bins still clogged; and that the material handlers still had to beat on the bins with hammers every two or three days. Finally, Sprout-Waldron's evidence indicated that no one at American Fructose or Sprout-Waldron was aware of any accidents similar to Mrs. Graham's in which someone was injured while beating a bin with a hammer. We conclude that Sprout-Waldron's evidence satisfies the burden for a prima facie showing that the storage bin was not defective or unreasonably dangerous.
Once Sprout-Waldron made a prima facie showing that it was entitled to a judgment, the burden shifted to the Grahams to present substantial evidence creating a genuine issue of material fact. Dunaway v. King, 510 So.2d 543 (Ala. 1987). The Grahams had to present substantial evidence that the residue bins left Sprout-Waldron's hands in a condition not reasonably to be expected by American Fructose or by its employees, such as Mrs. Graham, and that that condition made the product unreasonably dangerous. Casrell, 335 So.2d at 133; Sears,Roebuck Co., 395 So.2d at 995. As to the parties' expectations concerning the condition of the bins, the Grahams alleged no facts that would imply that the propensity of the bins to clog was not fully appreciated by all those concerned. The evidence establishes that the parties clearly contemplated that materials would stick to the residue bins, or bridge. The witnesses testified that bridging or clogging of this type of bin is an industry-wide problem, that there is no clear explanation for why it happens, and that it has happened at American Fructose's residue facility since it became operational in 1975. Indeed, unclogging the bins was a major component of a material handler's job.
On the issue of a party's expectations concerning a product's allegedly unreasonably dangerous condition, we note that this Court *Page 872 
has affirmed a summary judgment for a defendant under facts similar to those presented in this case. In Hawkins v.Montgomery Industries Int'l, Inc., 536 So.2d 922 (Ala. 1988), Hawkins was employed as a foreman of a planer mill in which lumber was run through a machine that shaved off enough of the wood to make the lumber smooth. The shavings were sucked from the planer by a fan and pushed down a small blowpipe into a receptacle from which they could be removed from the premises. The defendant designed and installed a new suction system to accompany a newly installed planer machine. When the system became clogged, the defendant was notified and one of its employees came to the mill to correct the problem. Management personnel of the planer company were aware that suction systems of this variety were subject to periodic clogging. On the date of Hawkins's injury, the blowpipe section had become clogged and, after several failed attempts to blow the shavings out using the system fans, a decision was made to cut holes in the elevated blowpipe section and to insert a fire hose to flush the clogged system with water pressure. After the makeshift water system failed, Hawkins and another employee worked from an elevated platform, taking turns poking at the clog and removing debris. When the pipe was finally unclogged, the backed-up water rushed through the cut-out hole and knocked the employees off the platform. Hawkins was severely and permanently injured in the fall.
Hawkins brought an action against the defendant as the designer and manufacturer of the suction system, alleging that the system was defectively or negligently designed or constructed. The plurality opinion applied the scintilla rule, affirmed the summary judgment entered on behalf of the defendant, and held that the blowpipe system was not defective within the meaning of the AEMLD. That opinion states:
 "The condition on which the Hawkinses rely as indicating defectiveness, the clogging of the blowpipe system, had occurred on many previous occasions without any resulting personal injury or property damage. It cannot be, and is not, argued by the appellants that the supposedly defective condition was not contemplated by T.R. Miller or its employees when T.R. Miller contracted to have the new blowpipe system installed by Montgomery Industries.
". . . .
 "It is undisputed from the depositions that at least some clogging of the blowpipe system was contemplated by the parties before, during, and after the new system was installed. . . . From the evidence presented in the record, it is clear that the blowpipe system was fit for its intended, though not perfect, purpose — that of removing the wood shavings from the planer machine."
Id., 536 So.2d at 925-26.
We find that the facts of the instant case are analogous. As with the blowpipe in Hawkins, it is evident here that clogging of the bins "had occurred on many previous occasions without any resulting personal injury or property damage." 536 So.2d at 925. In this case, some clogging was reasonably expected by the parties after the residue storage building was constructed. As noted above, clogging is an industry-wide problem and unclogging bins is a major component of a material handler's job at American Fructose.
Mrs. Graham contends that Hawkins is distinguishable because, she says, in this case "there were alternative safety measures which could have eliminated the danger [posed] to material handlers by the clogging of the residue bins." The Court inHawkins did not address whether there could have been a material issue of fact as to a defect in the suction system, despite the parties' expectation of clogging, if there had been substantial evidence presented of an alternative design or means to prevent clogging. The Grahams argue that the residue bins installed by Sprout-Waldron were defective or unreasonably dangerous and unfit for their expected use, because, the Grahams say, they could have been installed with vibrators that would have ensured flow and thus would have obviated the need to climb ladders and beat on the bins with hammers. The argument is, then, that the installation of vibrators *Page 873 
by Sprout-Waldron when the American Fructose facility was constructed in 1975 would have removed the unsafe or unfit condition that led to Mrs. Graham's injury.
It was incumbent upon the Grahams, therefore, to oppose the motion for summary judgment with substantial evidence specifically directed to the proposition that the vibrators available to Sprout-Waldron in 1975 would have obviated the need for material handlers such as Mrs. Graham to climb ladders and beat the bins with hammers. The Grahams' evidence opposing the summary judgment motion, viewed in the most favorable light, suggests the following: the original Sprout-Waldron salesman's report called for the installation of vibrators, but they were not installed; vibrators were available at the time of the sale and installation of the bins; beating on the bins with hammers to dislodge residue, to clear bridging, and to determine whether the bins were empty or were full may, after time, enhance clogging and cause leakage and may eventually knock the bins off their supports; American Fructose employees knew of other similar plants where vibrators had been installed; American Fructose employees requested that American Fructose install vibrators on their bins; an American Fructose maintenance employee stated that installation of vibrators was one alternative to try in an effort to solve the bridging problem; and a former employee of American Fructose, who subsequently worked in a similar capacity at a similar company, stated that the other company had vibrators on the bins to keep them unclogged and that "the vibrators they used kept the chutes clean and hammers were not needed to clean them."
The Grahams' evidence does not create a genuine issue of material fact; it would not support a finding that vibrators would have obviated the need for material handlers such as Mrs. Graham to climb ladders and beat the bins with hammers. Most of the evidence does not tend to establish the specific proposition that installation of vibrators would have, in fact, removed the allegedly unsafe condition that caused Mrs. Graham's injury. The statements of American Fructose's maintenance manager, that vibrators were one alternative to try in an effort to solve the bridging problem, do not express a judgment as to the effectiveness of that alternative as opposed to any others. In fact, Sprout-Waldron's motion for summary judgment establishes that the maintenance manager had had prior experience with bins equipped with vibrators and that those bins had clogged, necessitating the use of hammers. The best evidence that the Grahams presented on the issue is the affidavit from the former American Fructose material handler who stated that a company for which he later worked, in a similar capacity, had vibrators on its bins and that it did not need hammers to keep the chutes clean.
The former material handler's affidavit was not substantial evidence creating a genuine issue of material fact. "Substantial evidence" has been described as "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co.of Florida, 547 So.2d 870, 871 (Ala. 1989). The affidavit is not clear, but the affiant evidently worked for American Fructose for about 9 months about 15 years ago and at some time thereafter worked for the other company for about a year, six month of that year being in a job similar to that of a material handler at American Fructose. The affidavit does not state that the vibrators used at the other company would have been available to Sprout-Waldron in 1975. The affidavit does not state that the vibrators used at the other company would have functioned on the bins installed by Sprout-Waldron. The affidavit does not state that the materials or products involved at the other company were the same as, or similar to, those at American Fructose. The affidavit also does not state that the design or operation of the bins at the two companies was the same or was similar. In short, this affidavit does not constitute evidence of such "weight and quality" that the trier of fact could reasonably infer that vibrators available to Sprout-Waldron when it built the residue storage building would have prevented clogging. This is especially true in light of Sprout-Waldron's specific and detailed evidence that similar bins holding similar materials *Page 874 
and employing older vibrators, or even current model vibrators, still suffer from clogging. Therefore, we conclude that the Grahams presented no substantial evidence that directly tends to show that American Fructose material handlers would not have had to climb ladders and use hammers to unclog bins if Sprout-Waldron had installed vibrators on the bins.
In addition, this Court has noted that "because of the complex and technical nature of the product and in order to present evidence from which a lay jury may reasonably infer that a defective condition of the product was the cause of the product's failure and the cause of the resultant injury to the plaintiff, expert testimony is usually essential and, therefore, usually required." Brooks v. ColonialChevrolet-Buick Inc., 579 So.2d 1328, 1332 (Ala. 1991) (emphasis in original). Here, there is a difficult causation issue — whether vibrators available to Sprout-Waldron in 1975 would have, if installed, removed the allegedly unreasonably dangerous condition that caused Mrs. Graham's injury; resolving this issue requires several analytical steps, with corresponding factual predicates necessary for each step. The Grahams provided the affidavit of an expert who testified as to the commercial availability of vibrators that could have been attached to the bins installed by Sprout-Waldron in 1975 and testified that these vibrators were a feasible alternative to prevent clogging. Again, this evidence is insufficient to create a genuine issue of material fact as to the essential component of the Grahams' claim. The expert's testimony does not establish that the vibrators available to Sprout-Waldron in 1975 would have been preferable to, or more efficient than, unclogging the bins with hammers, much less that they would have obviated the need for material handlers such as Mrs. Graham to climb ladders and beat on the bins with hammers. Sprout-Waldron has established that at American Fructose's plant vibrators were disfavored because they did not perform any better than hammers on the railcar portion of the operation and that when the vibrators failed to prevent clogging, material handlers had to beat the sides of the cars with hammers to dislodge sticking materials and to unclog bridging. Presumably, even if the evidence showed that vibrators were successful in preventing clogging most of the time, the material handlers still would have to climb ladders and use hammers to check the bins to ensure that they were empty, as Mrs. Graham was doing when she was injured.
Thus, the Grahams' evidence presented in opposition to Sprout-Waldron's motion for summary judgment is not of "such weight and quality that fair-minded persons in the exercise of impartial judgment [could] reasonably infer" that the vibrators available to Sprout-Waldron in 1975 would have obviated the need for material handlers such as Mrs. Graham to climb ladders and beat the bins with hammers. West, supra. There was no genuine issue of material fact, then, as to whether the bins, as delivered, were "defective" or "unreasonably dangerous" within the meaning of the AEMLD. Therefore, the summary judgment for Sprout-Waldron was proper as to this issue.
The second major issue in this appeal is whether the summary judgment was proper as to the plaintiffs' claim that Sprout-Waldron was negligent in failing to install catwalks or protective scaffolding at the American Fructose plant to give employees a platform from which to unclog the residue bins with hammers. Initially, we note that the failure to install catwalks or protective scaffolding was not argued on appeal as part of the AEMLD claim, but only as a separate allegation of negligence. Therefore, we address it only as a claim of negligence.
The Grahams allege that Sprout-Waldron had the discretion to install catwalks when the residue storage building was constructed and that American Fructose installed movable scaffolding after Mrs. Graham's injury.[1] The Grahams, however, failed to present any legal argument that Sprout-Waldron's duty in this case extended beyond that of providing a product that is reasonably safe when put to its intended use. Cf. Hawkins,
 *Page 875 
536 So.2d at 925; Beech v. Outboard Marine Corp., 584 So.2d 447
(Ala. 1991).
The law does not impose upon a manufacturer a duty to manufacture an accident-proof or injury-proof product.Brooks, 579 So.2d at 1331. The Grahams assert that Sprout-Waldron had a duty to install catwalks or scaffolding, and they rely solely on Bailey v. Hogg, 547 So.2d 498
(Ala. 1989). In Bailey, this Court held that an employee's intentional failure to install an available safety guard was comparable to the intentional removal of a safety guard and could, therefore, serve as the basis for another employee's action against the co-employee under an exception to the "exclusive remedy" provision of the Alabama Workers' Compensation Act. That case is inapposite here. The safety guard in Bailey was a cover for a pulley; the guard was delivered with the machine that injured the plaintiff, but was not installed. The issue was not whether the cover was an appropriate or needed safety device, but whether the failure to install it satisfied the "willful conduct" exception of §25-5-11(c), Ala. Code 1975.
There is scant factual evidence here related to catwalks or scaffolding at all, much less as to whether they were needed to safely perform the task of unclogging the bins. Sprout-Waldron presented evidence that employees had cleared the bins from ladders since the residue storage building went into operation in 1975 and that no one knew of anyone — before Mrs. Graham — falling or getting hurt in that time. This evidence met Sprout-Waldron's burden of making a prima facie showing that it had no duty to install catwalks or scaffolding. The Grahams presented no substantial evidence tending to show that Sprout-Waldron had a duty to install catwalks or scaffolding. Therefore, the summary judgment was also proper as to this aspect of the Grahams' complaint.
AFFIRMED.
SHORES, HOUSTON, INGRAM and BUTTS, JJ., concur.
[1] Evidence of such subsequent remedial measures would ordinarily not be admissible at trial and, therefore, does not meet the requirement that evidence in support of, or in opposition to, a summary judgment motion must be admissible at trial. Ala.R.Civ.P. 56(e).