Carl and Dorothy-Helen Huprich, doing business as Huprich Arabians, sued David Bitto, alleging negligence and breach of the implied warranty of merchantability under Alabama's version of the Uniform Commercial Code ("UCC"), both claims arising from Bitto's sale of allegedly defective corn to the Hupriches. They subsequently amended their complaint to add a claim predicated on the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"), arguing that the corn was an unreasonably dangerous product placed on the market by Bitto. After anore tenus proceeding, the trial judge held that Bitto was not a "merchant" and was therefore exempt from the UCC, and that he was not liable under the AEMLD. The Hupriches appeal.
Where evidence is presented to the trial court ore tenus, a presumption of correctness exists as to the court's judgment based on its findings of fact. The judgment will not be disturbed unless it is clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence. Gaston v. Ames, 514 So.2d 877 (Ala. 1987). However, when the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court's judgment. Gaston.
 I.
The Hupriches are in the business of breeding and selling Arabian horses. In August 1989, they had approximately 50 horses on their farm. Carl Huprich contacted Bitto, a farmer, to inquire whether Bitto had corn for sale. At Mr. Huprich's request, Bitto provided Mr. Huprich with a sample of corn to be tested for "aflatoxin," a toxin then known to be sometimes present in feed corn. The test revealed no presence of aflatoxin in the sample, and the Hupriches bought from Bitto approximately 247 bushels of corn to feed to their horses.
The Hupriches began feeding the corn to their horses within two days after they received it. Approximately three weeks later, on September 19, 1989, one of the horses died; a second horse died within a week after that. At first they were unsure about the cause of these deaths; the two horses were both found outside the fences of the farm, but did not appear to have been struck by a vehicle. A third horse began to develop unusual symptoms, such as staggering wildly about and convulsively pressing its head against the stable wall. The third horse died, along with another two that exhibited the same symptoms.
The Hupriches' veterinarian, Dr. Albert Corte, determined that all five horses died from leukoencephalomalacia, a disease that causes an animal's brain to radically soften and that is always fatal. Leukoencephalomalacia develops from a toxin known as Fumonisin B-1, which grows on a type of mold known as "Fusarium Monoliforme." The mold is commonly present in feed corn; it *Page 687 
does not itself cause the disease if it is consumed by a horse, but, if it is exposed to certain temperature and humidity conditions in storage, the Fumonisin B-1 toxin that does cause the disease may be formed in it.
There is evidence that the corn that Bitto sold to the Hupriches may have contained the mold Fusarium Monoliforme; there is no evidence, however, that the mold had already formed the toxin Fumonisin B-1. In 1989, it was not widely known that the Fumonisin B-1 toxin causes leukoencephalomalacia, and at that time corn was not tested for the presence of the toxin or the mold from which it may develop. The Fumonisin B-1 toxin is not detectable by sight or smell.
 II.
The Hupriches argue that the corn they bought from Bitto was unfit for the purpose for which they bought it and that they are therefore entitled to recover from Bitto for breach of an implied warranty of merchantability under Ala. Code 1975, §7-2-314.
Section 7-2-314 provides that an implied warranty of merchantability from the seller exists for certain sales contracts where the seller is a "merchant with respect to goods of that kind." The UCC defines "merchant":
 " 'Merchant' means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill."
Ala. Code 1975, § 7-2-104(1).
Ordinarily, a farmer is not considered to be a merchant under this definition; the fact that a farmer is astute in selling his own product is not sufficient to make him a "dealer" in these products. Loeb Co. v. Schreiner, 294 Ala. 722,321 So.2d 199 (1975). In Loeb, the Court held that the defendant cotton farmer was not a "merchant" under the UCC, because there was no evidence that, by his occupation, he held himself out as a seller of goods with the expertise and skills of a professional merchant. In contrast, the Court of Civil Appeals held in Bradford v. Northwest Alabama Livestock Ass'n,379 So.2d 609 (Ala.Civ.App. 1980), that a cattle farmer who employed an agent to sell his livestock, and who himself had been in the business of selling cattle, held himself out as having the knowledge and skill to conduct these sales on the level of a professional merchant.
Here, the evidence shows that Bitto does not advertise his corn crop, that he does not generally solicit sales, and that he relies mainly on word of mouth to sell corn. There was evidence that he may have, on some occasions, mentioned to the county agricultural agent that he had corn for sale, but there is no indication that he did this with any frequency or otherwise employed an agent to sell the corn he grew. Under these facts, we find no error in the trial court's conclusion that Bitto is not a "merchant" as defined under the UCC.
 III.
The Hupriches next argue that they are entitled to recover on their AEMLD claim. We note that the term "manufacturer," as it is used in regard to this cause of action, is applicable to every seller engaged in the business of selling products.Caudle v. Patridge, 566 So.2d 244 (Ala. 1990).
In order to establish a prima facie case for liability under the AEMLD, a plaintiff must prove he suffered injuries or damages to himself or his property by one who sold a product in a defective condition, unreasonably dangerous to the plaintiff as the ultimate user or consumer. Atkins v. American MotorsCorp., 335 So.2d 134 (Ala. 1976). In cases involving food products sold by merchants for human ingestion, this Court has adopted the "reasonable expectations" test for determining if food is unreasonably dangerous. Allen v. Delchamps, Inc.,624 So.2d 1065 (Ala. 1993); see, also, Cain v. Sheraton PerimeterPark South Hotel, 592 So.2d 218 (Ala. 1991), and Ex parteMorrison's Cafeteria of Montgomery, Inc., 431 So.2d 975 (Ala. 1983). The pivotal issue in the reasonableness test is what a consumer is reasonably *Page 688 
justified to expect to find in food bought for human consumption. Allen v. Delchamps, Inc. Adapting this test to the slightly different factual context of this case, we get the issue of what the Hupriches could reasonably expect to find in the corn they bought from Bitto.
The record indicates that the Fusarium Monoliforme mold may have been present in the corn when Bitto sold it to the Hupriches, that the mold was commonly found in corn used as animal feed, and that the mold itself would not have caused the disease that killed the horses. Even if the mold was present, there was no evidence that the Fumonisin B-1 toxin was present in the mold when Bitto sold it to the Hupriches; it was not widely known at that time to develop from the mold or to cause leukoencephalomalacia, and there was no reasonable test for determining its presence.
Based on this evidence, the trial court held that even if the Fumonisin B-1 toxin was present in the corn that the Hupriches bought from Bitto, they could not have reasonably expected to find it there; thus, the trial court recognized the Hupriches' prima facie case for their AEMLD claim. Just as importantly, however, the trial court held that Bitto likewise could not have known of the presence of the Fumonisin B-1 toxin and that therefore there was a lack of causal connection between Bitto and the Hupriches' loss.
To establish a lack of causal relation as a defense to an AEMLD claim, a defendant may show that he received a product in a defective condition, that he did not contribute to this defective condition, and that he had neither knowledge of the defective condition nor an opportunity to inspect the product that was superior to the knowledge or opportunity of the consumer. Allen v. Delchamps, Inc., supra.
The record shows that if feed corn contains Fusarium Monoliforme mold and is stored in conditions that combine heat of 80°F. or higher with a level of humidity in the corn at a range of 18%-19%, the mold may develop the Fumonisin B-1 toxin in as little as 24 hours. The evidence shows that Bitto routinely dried his corn to low moisture levels and then stored it in bins that were well-ventilated to control the temperature and humidity level of storage. Thus, there is no evidence that the toxin was present at the time of the sale or that Bitto contributed to the development of the toxin. Because little was known in 1989 about the toxin and its development, it is clear that Bitto had neither knowledge of the defective condition nor an opportunity to inspect the product that was superior to the knowledge or opportunity that the Hupriches had. Because Bitto established the lack of a causal connection between him and the Hupriches' loss, the trial court correctly found in his favor on the AEMLD claim.
The trial court's judgment is affirmed.
AFFIRMED.
HORNSBY, C.J., and ALMON, HOUSTON, and INGRAM, JJ., concur.